# THE UNITED STATE DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| SAMY WADIE MIKHAIL HABASHY | : | |
| 2219 Burgoyne Court | : | |
| Columbus, Ohio 43220 | : | |
| | : | |
| Plaintiff, | : | Case No. 2:23-cv-1864 |
| | : | |
| v. | : | JUDGE |
| | : | |
| WALMART, INC. | : | MAGISTRATE JUDGE |
| 702 SW 8th St. | : | |
| Bentonville, Arkansas 72716 | : | **JURY DEMAND ENDORSED HEREON** |
| | : | |
| c/o Statutory Agent: | : | |
| | : | |
| CT CORPORATION SYSTEM | : | |
| 4400 Easton Commons Way | : | |
| Columbus, Ohio 43219 | : | |
| | : | |
| Defendant. | | |

## COMPLAINT

Plaintiff Samy Wadie Mikhail Habashy ("Plaintiff"), for his Complaint against Defendant Walmart, Inc. ("Defendant"), hereby states as follows:

## PARTIES

1. Plaintiff is a resident of Columbus in Franklin County, Ohio. Plaintiff brings this action to redress injuries committed against him as a result of Defendant's actions.

2. Upon information and belief, Defendant is an Arkansas corporation registered to do business in the state of Ohio.

3. Upon information and belief, Defendant does business as Walmart, Inc.

4. Upon information and belief, Defendant conducts substantial business activity in Franklin County, Ohio.

1

5. Plaintiff was an "employee" as defined in Chapter 4112 of the Ohio Revised Code and Title VII of the Civil Rights Act of 1964.

6. Defendant is an "employer" as defined in Chapter 4112 of the Ohio Revised Code and Title VII of the Civil Rights Act of 1964.

## JURISDICTION AND VENUE

7. This action is brought pursuant to Title VII of the Civil Rights Act of 1964, the Ohio Laws Against Discrimination, and R.C. Chapter 4112 ("Chapter 4112"). This Court's jurisdiction in this matter is also predicated upon 28 U.S.C. §1367 as this Complaint raises claims pursuant to the laws of Ohio, over which this Court maintains supplemental subject matter jurisdiction.

8. Venue is proper in this forum pursuant to 28 U.S.C. §1391, because Plaintiff entered into an employment relationship with Defendant in the Southern District of Ohio, Plaintiff performed his job duties there, and Defendant is doing and has done substantial business in the Southern District of Ohio.

9. This Complaint is being timely filed within 90 days of Plaintiff's receipt of Notice of Right to Sue from the U.S. Equal Employment Opportunity Commission. (Exhibit A)

## FACTS

10. Plaintiff moved to the United States from Egypt on or about February 12, 2022. Plaintiff's race is African and his national origin is Egyptian.

11. Plaintiff is an Egyptian immigrant working in the United States of America with Permanent Residency status.

12. English is Plaintiff's second language. Accordingly, Plaintiff has a strong Egyptian accent and does not speak fluent English.

13. Plaintiff began working for Defendant as a Stocker on or about July 14, 2022, at the Walmart Supercenter #3812, located at 2700 Bethel Road, Columbus, Ohio 43220. Plaintiff's hourly wage was $18.50.

14. Plaintiff remained in this position until his termination on or about December 28, 2022.

15. Plaintiff's job duties as a Stocker included, but were not limited to opening and unpacking shipments, and stocking shelves.

16. Plaintiff was supervised by Mr. Allan Heaggans.

17. Plaintiff noticed disparate treatment almost immediately after he started.

18. Mr. Heaggans started to discriminate against Plaintiff in several ways. For example, in or around the first month of Plaintiff's employment, Mr. Heaggans assigned tasks to the whole team, which were to be completed by 5:00am.

19. Between 3:00 and 3:15am, Mr. Heaggans approached Plaintiff and asked "Why haven't you completed this yet?" Plaintiff said, "you gave us until 5am."

20. One of Plaintiff's colleagues told Mr. Heaggans to give Plaintiff a chance to complete his assignment.

21. Mr. Heaggans refused and told Plaintiff to leave immediately or else he would lose his job permanently.

22. Mr. Heaggans made Plaintiff clock out and go home early because he did not finish the task fast enough. Plaintiff clocked out as instructed.

23. In or around September or October 2022, Plaintiff was scheduled to start his shift at 10pm. The schedule was posted online, which Plaintiff had access to.

24. Despite evidence of the correct start time of Plaintiff's shift, Mr. Heaggans told Plaintiff he was incorrect, and he was supposed to be there at 11pm, not 10pm.

25. The following day, Plaintiff was given a write up for not following his proper schedule, even though it was scheduled for 10pm. In essence, Plaintiff was written up for showing up to work early.

26. On nearly every occasion, Mr. Heaggans typically walked by everyone and just left them alone, but Mr. Heaggans would sit by Plaintiff and wait for him to do something wrong, so he could yell at him.

27. On several occasions, Plaintiff witnessed colleagues that were not reprimanded by Mr. Heaggans.

28. For example, Plaintiff would put stuff on the shelf a few centimeters off, and Mr. Heaggans would yell and chastise Plaintiff.

29. Mr. Heaggans would see other Americans working slowly and would not say anything.

30. However, he would immediately yell at Plaintiff, and would reprimand Plaintiff if he did not finish his tasks early.

31. Plaintiff contends that a lot of employees were unable to do some of the more difficult work, such as lifting heavy, large or awkwardly shaped items.

32. Plaintiff was one of the few people who was able to do the work but was the only person who was reprimanded.

33. Plaintiff often finished his work early and would go help other employees out with their tasks.

34. Plaintiff would seek his supervisor's approval to work through his 15-minute breaks to make Mr. Heaggans happy. Despite that, Mr. Heaggans was not happy with Plaintiff's work.

35. Upon information and belief, one of Plaintiff's colleagues asked Plaintiff why he would work so hard, including working through his 15-minute break.

36. Plaintiff replied that he was determined to please Mr. Heaggans. The colleague replied that if Mr. Heaggans ever criticized his work, Plaintiff should tell him that he was doing the best that he could.

37. Plaintiff's coworkers were assigned to work in teams between 2 and 4 members, even if the volume of work was less and the weight of the products being stocked and shelved were light enough for one employee to handle.

38. Accordingly, Plaintiff contends that other employees were able to stock products to their respective departments easier, such as clothing or beauty products.

39. However, Plaintiff was the only person who was assigned to work alone, and with a much larger and heavier workload because the Plaintiff's responsibilities were in the hardware and athletics departments.

40. Upon information and belief, the night Plaintiff was sent home early in or around September and October 2022, several people witnessed Plaintiff being told to go home early.

41. The following day, Plaintiff was told by other coworkers that they had no idea why he was forced to go home, but they did not want to ask Mr. Heaggans why he was not letting him finish his shift in front of Plaintiff out of fear that Mr. Heaggans would retaliate against them.

42. Although Mr. Heaggans only sent Plaintiff home early on two occasions, there were several times where Mr. Heaggans reduced Plaintiff's hours.

43. For example, Plaintiff's many colleagues would get 40-hour work weeks, yet Plaintiff only received enough shifts for a 14-hour work week.

44. Plaintiff went to the Lead of People and asked why he only had 14 hours on the schedule.

45. Upon information and belief, the Lead of People replied that she knew Plaintiff was a hard worker and a good employee and agreed to give him more hours.

46. On one occasion, Plaintiff needed to leave for half an hour.

47. Plaintiff utilized a half hour of sick time leave, then Plaintiff discovered that Mr. Heaggans docked 1 hour and 15 minutes for the time he had to leave work even though Plaintiff had only used 30 minutes of his sick time leave.

48. Plaintiff was told he had to sweep and mop the floor of the entire store. Plaintiff was asked to do this even though one of his colleague's primary responsibilities is to clean the floor.

49. Upon information and belief, that colleague responsible for cleaning the floor was working at the time that the Plaintiff was instructed to clean the floor.

50. On or about December 27, 2022, Team Lead Samantha Gross assigned Plaintiff to unload six palettes of stock and three large boxes by himself.

51. Upon information and belief, each pallet contained between 30 – 60 boxes.

52. Upon information and belief, typically this assignment would take 6 hours.

53. However, Plaintiff was only given two hours to complete the task.

54. Upon information and belief, Plaintiff completed the work in three and a half hours.

55. Mr. Heaggans then told Plaintiff to go help his colleagues in another section. A few minutes later, Ms. Gross sent Plaintiff home.

56. Plaintiff was terminated on December 28, 2022, by Team Lead Samantha Gross.

57. Plaintiff was terminated despite never receiving a point deduction, per the Walmart No Call/No Show Employee Point System.

58. Throughout his employment, Plaintiff received secondary feedback from an unnamed Front-End Team Lead who helped Plaintiff apply for his role at Walmart.

59. Upon information and belief, this Team Lead would often be in touch with Mr. Heaggans and relay feedback to the Plaintiff.

60. When Plaintiff asked the Front-End Team Lead for any feedback, he would often reply "No news is good news".

61. Upon information and belief, Ms. Gross was in the team lead position for no more than one month before she terminated Plaintiff.

62. Plaintiff's termination occurred even though she had far less experience than another Team lead, Andro LNU, who was also responsible for supervising the Plaintiff's work.

63. Upon information and belief, several people were in the team lead position yet Defendant could not keep employees in that position, thus Defendant promoted Ms. Gross, despite her lack of team lead experience.

64. Ms. Gross took all direction from Allan Heaggans, and Plaintiff believed Mr. Heaggans was racist.

65. At the time of his termination, Mr. Heaggans was waiting by the door for Plaintiff.

66. Plaintiff tried to say "yesterday I got all of my work done, I do not understand." However, Mr. Heaggans cut him off at "yesterday.." and said, "I do not care, you are terminated. Get out of here! Get out. Go home!" Mr. Heaggans was very close to Plaintiff and was yelling at him.

67. Days after being terminated, Plaintiff asked Lead of People why his employment was terminated. She merely replied "I'm sorry."

68. Since his termination, Plaintiff has tried to apply at other stores, but has not been successful.

## COUNT I
**(Race/National Origin Discrimination – R.C. 4112.02)**

69. Plaintiff realleges herein each of the allegations contained in the preceding paragraphs of his Complaint as if fully restated herein.

70. Plaintiff is a member of a protected class based on his national origin (Egyptian) and race (North African).

71. On or around December 28, 2022, Defendant terminated Plaintiff's employment.

72. At the time of his termination, Plaintiff was qualified for the position he held.

73. Defendant discriminated against Plaintiff on the basis of race and national origin by terminating his employment, and/or refusing to transfer, rehire or recall him into other available positions for which he was qualified and otherwise treated him less favorably than other non-Egyptian and non-North African employees in the terms and conditions of employment, in violation of Chapter 4112.02 of the Ohio Revised Code.

74. Non-Egyptian and non-North African employees were subject to different standards and rules. Plaintiff was disciplined and reprimanded for engaging in the same behavior as other employees. Plaintiff was denied opportunities to work his full shifts which were given to other employees.

75. Upon information and belief Plaintiff was replaced by, or his termination permitted the retention of, a non-Egyptian and non-North African employee.

76. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer lost wages and fringe benefits.

77. As a direct and proximate result of Defendant's conduct, Plaintiff suffered emotional distress including shame, humiliation, embarrassment, and mental anguish.

78. Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for all legal damages and other relief available under Ohio Revised Code Chapter 4112, including but not limited to punitive damages.

**COUNT III**
**(Race/National Origin Discrimination – Title VII)**

79. All of the preceding paragraphs are realleged as if fully rewritten herein.

80. This claim is brought pursuant to Title VII of the Civil Right Act of 1964.

81. Plaintiff is a member of a protected class based on his national origin (Egyptian) and race (North African).

82. On or around December 28, 2022, Defendant terminated Plaintiff's employment.

83. At the time of his termination, Plaintiff was qualified for the position he held.

84. Defendant discriminated against Plaintiff on the basis of race and national origin by terminating his employment, and/or refusing to transfer, rehire or recall him into other available positions for which he was qualified and otherwise treated him less favorably than other non-Egyptian and non-North African employees in the terms and conditions of employment, in violation of Chapter 4112.02 of the Ohio Revised Code.

85. Non-Egyptian and non-North African employees were subject to different standards and rules. Plaintiff was disciplined and reprimanded for engaging in the same behavior as other employees. Plaintiff was denied opportunities to work his full shifts which were given to other employees.

86. Upon information and belief, Plaintiff was replaced by, or his termination permitted the retention of, a non-Egyptian and non-North African employee.

87. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including but not limited to pain and suffering and the loss of salary, benefits and other terms, privileges and conditions of employment for which Defendant is liable.

88. Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for compensatory damages, punitive damages and reasonable attorney's fees and costs.

WHEREFORE, Plaintiff demands back pay and benefits, or front pay and benefits, whichever is appropriate, in an amount to be determined at trial, but in any event not less than $75,000.00, compensatory damages, liquidated damages, punitive damages, emotional distress damages, pre-judgment interest, post-judgment interest, costs, attorneys' fees and any and all other relief, which the Court deems just and appropriate.

Respectfully submitted,

/s/ *Rachel Sabo Friedmann*

_____
Rachel Sabo Friedmann (0089226)
(Rachel@thefriedmannfirm.com)
Casey D. Mayell (0102178)
(Casey@thefriedmannfirm.com)
**The Friedmann Firm, LLC**
3740 Ridge Mill Dr.
Hilliard, Ohio 43026
Phone: (614) 610-9757
Fax: (614) 737-9812

*Attorneys for Plaintiff*

## **JURY DEMAND**

Plaintiff hereby requests a jury of eight (8) persons to hear all issues so triable.

/s/ *Rachel Sabo Friedmann*

———————————————
Rachel Sabo Friedmann (0089226)